**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

KYLE BERMINGHAM,

        Plaintiff,

v.                                    Case No. 5:12-cv-37-Oc-37PRL

CITY OF CLERMONT, FLORIDA; and
STEPHEN GRAHAM,

        Defendants.
_____

**ORDER**

This cause is before the Court on the following:

1.    Defendant Stephen Graham's Motion for Summary Judgment (Doc. 39), filed May 10, 2013;

2.    Plaintiff's Cross-Motion for Summary Judgment and Supporting Memorandum of Law (Doc. 41), filed May 10, 2013;

3.    Defendant City of Clermont, Florida's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 45), filed May 10, 2013;

4.    Plaintiff's Response in Opposition to Defendant Stephen Graham's and Defendant City of Clermont's Respective Motions for Summary Judgment (Doc. 50), filed May 24, 2013;

5.    Defendant Stephen Graham's Memorandum of Law in Opposition to Plaintiff's Cross-Motion for Summary Judgment (Doc. 52), filed June 10, 2013; and

6.    Defendant City of Clermont, Florida's Opposition to Plaintiff's Cross-

Motion for Summary Judgment and Supporting Memorandum of Law (Doc. 54), filed June 10, 2013.

## BACKGROUND

Plaintiff served as an officer with Defendant City of Clermont's Police Department from October 2006 until his termination in 2010. (Doc. 3, ¶ 2.) During his employment, Plaintiff was the subject of twelve internal affairs and professional standards investigations. (Doc. 39-23.) As a result, Plaintiff was counseled on several occasions, received a written reprimand, and was temporarily suspended. (*Id.*; Doc. 39-28; Doc. 39-41, p. 12.) These disciplinary actions were unrelated to the events that triggered Plaintiff's termination. (*See* Doc. 39-23; Doc. 39-28; Doc. 39-41, p. 12.)

On June 6, 2009, Defendant Stephen Graham, the Chief of Police, responded to a domestic disturbance complaint. (Doc. 44-1, Graham Arbitration Testimony (Bermingham) 74:13–76:3.) Upon arrival, the victim was standing outside her apartment while the suspect was inside. (*Id.*) Graham then entered the apartment without a warrant to arrest the suspect. (Doc. 39-1, Bermingham Dep. 101:8–102:3.) According to Plaintiff, Graham unlawfully threatened the victim into giving the police access to her apartment, in violation of Florida Statutes § 836.05. (*Id.*) Plaintiff also contended that Graham unlawfully broke in the apartment door.[1] (*Id.*)

Plaintiff reported Graham's behavior on two occasions. (*Id.* at 109:4–110:19.) On October 2, 2009, Plaintiff and five other officers went to the Orlando office of the Florida Department of Law Enforcement ("FDLE"). (*Id.* at 117:22–119:15; Doc. 42-5, Graham Dep. 64:17–65:8.) Plaintiff told FDLE about an altercation between Graham and another

---

[1] Though Plaintiff was not present during the arrest, he learned of the incident through word-of-mouth from other police officers. (Doc. 39-1, Bermingham Dep. 105:5–106:9.)

officer.[2] (Doc. 39-1, Bermingham Dep. 119:7–25.) Three days later, Plaintiff reported the arrest incident during a follow-up conversation with FDLE. (Doc. 39-2, Bermingham Dep. 130:24–132:10.)

Next, Plaintiff learned that his co-worker Sergeant Kim Meintzschel was drafting a complaint to City Manager Wayne Saunders regarding the June 6, 2009 arrest. (Doc. 39-1, Bermingham Dep. 111:15–112:8.) Using his private cell phone, Plaintiff called Meintzschel to opine that Graham broke the law. (*Id.* at 112:9–17, 113:3–12.) After the phone conversation, Plaintiff annotated Florida Statutes § 836.05 and emailed it to Meintzschel. (*Id.* at 114:7–115:4.) On October 9, 2009, Meintzschel sent an email to Saunders and the captains of the Police Department outlining her and Plaintiff's concerns. (Doc. 46-38.) Upon receipt of Meintzschel's email, Saunders ordered FDLE to investigate the complaint. (Doc. 46-39; Doc. 46-40.) After an investigation, FDLE found that no criminal conduct had occurred during the June 6, 2009 arrest. (Doc. 46-39; Doc. 46-40.)

In April 2010, Plaintiff was terminated. (Doc. 54-2.) The City's interoffice memoranda state that Plaintiff was discharged because his "actions in assisting and participating with Sgt. Meintzschel in bringing unwarranted charges of criminal activity against Chief Graham in connection with the June 6, 2009 arrest incident constitute conduct unbecoming a member of the Department." (Doc. 54-1, p. 2; *see also* Doc. 54-2.) Plaintiff contends that his expression that "[Graham] broke the law and violated the Constitution" is protected by the First Amendment and that his termination was therefore unlawful. (Doc. 39-1, Bermingham Dep. 99:20–23.)

---

[2] Plaintiff later testified that he could not recall whether he referenced the June 6, 2009 arrest incident during that meeting. (Doc. 39-1, Bermingham Dep. 120:6–13.)

The officers who accompanied Plaintiff to FDLE were also disciplined. (Doc. 44-3, Graham Arbitration Testimony (Garrett) 96:7–98:11.) Members of the public and former police officers then began attending City Council meetings to opine that the Police Department was corrupt and that the officers' discipline was unfair. (Doc. 43-2, Saunders Dep. 27:11–33:13.) Saunders was aware of these complaints. (*See id.*)

Following his termination, Plaintiff challenged whether he was discharged for "just cause." (Doc. 39-44; Doc. 39-45.) In accordance with the Collective Bargaining Agreement between the International Union of Police Associations and the City, Plaintiff first appealed his termination to Saunders. (Doc. 39-18, pp. 31–32; Doc. 39-1, Bermingham Dep. 78:12–79:24.) Saunders testified that he did not review Plaintiff's entire record in detail during Plaintiff's appeal. (Saunders Dep. 82:9–20.) Nonetheless, Saunders upheld Plaintiff's termination. (Doc. 39-44; Doc. 44-2, Saunders Arbitration Testimony 117:9–14.) Plaintiff then took his grievance to arbitration. (Doc. 39-45.) After four days of arbitration proceedings, the arbitrator denied Plaintiff's grievance and found that the City had just cause to terminate him. (*Id.*)

Thereafter, Plaintiff brought this suit against the City and against Graham in his individual and official capacities. (Doc. 1.) In Counts I and II, Plaintiff seeks relief pursuant to 42 U.S.C. § 1983 for violations of his First Amendment rights.[3] (*Id.* ¶¶ 50–68.) In Count III, Plaintiff seeks relief for violations of the Law Enforcement Officers' Bill of Rights ("LEOBOR"), Fla. Stat. §§ 112.531 *et seq.* (*Id.* ¶¶ 69–74.)

Each of the parties has filed a motion for summary judgment, to which each

---

[3] As noted in the Court's prior Order (*see* Doc. 26), the basis for Count II is unclear. As Plaintiff did not file an amended complaint to clarify his claim, the Court construes Count II as duplicative of Count I and considers Plaintiff to bring only a § 1983 claim based on the First Amendment.

responded. Graham and the City both moved for summary judgment on Plaintiff's First Amendment and LEOBOR claims. (Doc. 39; Doc. 45.) The City also moved for summary judgment on the issue of § 1983 municipal liability. (Doc. 45.) Plaintiff filed a cross-motion for summary judgment on his First Amendment and LEOBOR claims and on the issue of municipal liability. (Doc. 41.) This cause is now ripe for the Court's adjudication.

## STANDARDS

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To defeat a motion for summary judgment, the nonmoving party must "go beyond the pleadings, and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991).

"Cross motions for summary judgment do not change the standard." *Perez-Santiago v. Volusia Cnty.*, No. 6:08-cv-1868-Orl-28KRS, 2010 WL 917872, at *2 (M.D. Fla. Mar. 11, 2010) (quoting *Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church*, 499 F.3d 32, 38 (1st Cir. 2007)) (internal quotation marks omitted); *see also Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). "Cross motions for summary judgment are to be treated separately; the

denial of one does not require the grant of another." *Santiago*, 2010 WL 917872 at *2 (citations and internal quotation marks omitted). When considering cross-motions for summary judgment, the Court must "consider and rule upon each party's motion separately and determine whether summary judgment is appropriate as to each under the Rule 56 standard." *Monumental Paving & Excavating, Inc. v. Pa. Mfrs.' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999) (citations omitted).

## DISCUSSION

The first inquiry is whether Plaintiff has presented evidence of a constitutional violation—that is, whether Defendants infringed upon Plaintiff's First Amendment right to free speech. The second inquiry is whether the City may be held liable for Plaintiff's injury. Lastly, the Court analyzes Plaintiff's LEOBOR claim.

### I. **First Amendment**

Section 1983 imposes liability on any state actor who deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws." *U.S. Steel, LLC v. Tieco, Inc.*, 261 F.3d 1275, 1288 (11th Cir. 2001). "It is axiomatic that a state may not demote or discharge a public employee in retaliation for protected speech." *Tindal v. Montgomery Cnty. Comm'n*, 32 F.3d 1535, 1539 (11th Cir. 1994) (quoting *Morgan v. Ford*, 6 F.3d 750, 753–54 (11th Cir. 1993)) (internal quotation marks omitted). However, a public employee's right to freedom of speech is not absolute. *See Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989). To determine whether a state actor has retaliated against an employee because of the employee's protected speech, the Court applies a four-pronged test. *See Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 841 (11th Cir. 2000).

First, the Court considers whether the employee's speech is "fairly characterized as constituting speech on a matter of public concern." *Bryson*, 888 F.2d at 1565 (citation and internal quotation marks omitted). If it is, the Court decides whether the speech is protected by applying the *Pickering* balancing test, which weighs the employee's free speech interest against "the interest of the state, as an employer, in promoting the efficiency of the public services it performs." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).

If those two prongs are satisfied, the fact-finder must then determine "whether the speech that the court has identified as protected played a substantial part in the employment decision." *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1157 (11th Cir. 2002). If so, the fact-finder must also determine whether the employer has proved "that it would have reached the same decision even in the absence of the protected [speech]." *Id.*

### A.  Matter of Public Concern

"When a public employee speaks as an employee on matters of personal interest and not as a citizen upon matters of public concern, the First Amendment is not implicated." *Id.* "Whether a public employee's speech was on a matter of public concern is determined by reviewing the content, form, and context of a given statement as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983). Relevant factors include whether the "main thrust" of the speech was public or private in nature, whether the speech was communicated to the public or to an individual, and the speaker's motivation. *See Vila v. Padron*, 484 F.3d 1334, 1340 (11th Cir. 2007).

Defendants contend that Plaintiff's speech was not protected because he spoke

on an internal employment issue.[4] (Doc. 39, pp. 22–24.) The Court disagrees. The U.S. Court of Appeals for the Eleventh Circuit has repeatedly held that government misconduct, corruption, and the improper performance of law enforcement duties are matters of public concern. *See, e.g.*, *Fikes v. City of Daphne*, 79 F.3d 1079, 1084 (11th Cir. 1996) (noting that "the question of whether police officers are properly performing their duties, as a public safety issue, must be considered an issue of political or social concern"); *Cooper v. Smith*, 89 F.3d 761, 765 (11th Cir. 1996) ("There can be no doubt that corruption in a police department is a matter of public concern."); *Bryson*, 888 F.2d at 1563–64, 1566 (holding that a police captain's complaint that the police chief stole whiskey from the evidence room addressed a matter of public concern because the complaint alleged corruption within the police department).

Here, Plaintiff questioned whether Graham was properly performing his law enforcement duties.[5] Consequently, Plaintiff's speech to FDLE and Meintzschel involved a matter of public concern. This prong is satisfied.

## B. *Pickering* Balancing

Next, the Court must weigh Plaintiff's interest in voicing his belief that Graham

---

[4] Graham relies heavily (Doc. 39, pp. 23–24; Doc. 52, pp. 6, 8–9.) on *Morris v. Crow*, 142 F.3d 1379 (11th Cir. 1998). However, *Morris* is not controlling. In that case, a police officer was terminated after he filed an accident report containing statements that were unfavorable to the police department. *Id.* at 1381. The officer's speech was not a matter of public concern because "[the officer's] report was generated in the normal course of his duties as an accident investigator . . . . [H]e prepared the report because that was his job." *Id.* at 1382. Unlike in *Morris*, Plaintiff's job did not require him to report Graham's alleged misconduct; therefore, that case is inapposite.

[5] Though Plaintiff did not have firsthand knowledge of the June 6, 2009 arrest incident, the speculative nature of Plaintiff's speech is irrelevant to the "public concern" inquiry. *See, e.g.*, *Stanley v. City of Dalton*, 219 F.3d 1280, 1289 (11th Cir. 2000) (holding that the theoretical form of a police captain's statements did not "defeat the public concern nature of [his] speech").

broke the law against the interest of the Police Department in maintaining order, discipline, morale, and harmony. *See Bryson*, 888 F.2d at 1565. In striking this balance, the Court considers: "(1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time, and place of the speech, and (3) the context within which the speech was made." *Id.* at 1567.

While it has recognized a heightened need for order, loyalty, morale, and harmony in a law enforcement agency, the Eleventh Circuit has held that the *Pickering* balancing test favors law enforcement officers' speech so long as their speech was non-disruptive and made appropriately. *Compare id.* at 1564 (finding that *Pickering* balancing weighed against a police officer where his "bitter complaints to all who would listen in the police department . . . severely undermined the morale of the police department"), *and Hansen v. Soldenwagner*, 19 F.3d 573, 574, 578 (11th Cir. 1994) (finding that *Pickering* balancing weighed against a police officer who "ridiculed other officers as inexperienced" and testified that the police department's actions were "ridiculous" and "stupid"), *with Cooper*, 89 F.3d at 762, 766 (finding that *Pickering* balancing weighed in favor of a police officer because he did nothing except "express the facts as he knew them").

Here, Plaintiff used his private cell phone and was off-duty when he complained about Graham's conduct to Meintzschel and FDLE. (Doc. 39-1, Bermingham Dep. 113:7–18, 116:4–12.) Further, he expressed his concerns to a limited number of people with authority to correct the improper conduct that he perceived. On the current record, the Court finds that unlike the plaintiffs in *Hansen* and *Bryson*, Plaintiff was not vulgar, nor did he complain to "all who would listen." *See Bryson*, 888 F.2d at 1564. He simply expressed the facts as he knew them. *See Cooper*, 89 F.3d at 762, 766. *Pickering*

balancing weighs in favor of Plaintiff, and his expression is therefore protected.

## C.  Causation

According to the City's interoffice memoranda, Plaintiff was discharged because his "actions in assisting and participating with Sgt. Meintzschel in bringing unwarranted charges of criminal activity against Graham in connection with the June 6, 2009 arrest incident constitute conduct unbecoming a member of the Department."[6] (Doc. 54-1; Doc. 54-2.) During his deposition, Graham stated that Plaintiff's complaint to FDLE played a role in his decision to investigate Plaintiff. (Graham Dep. 33:17–34:15.) However, during Plaintiff's arbitration proceeding, when asked why Plaintiff was terminated, Graham responded:

> His work history, we had some problems with him in the past. Had some issues. He didn't demonstrate an ability to work with us to turn around. It was more any time we brought issues of performance, he was argumentative and basically took a stance that he was right. If we brought up the issue, it was wrong. It was obvious that he wasn't going to change his behavior. In light of the progressive discipline, I made the decision to terminate.

(Graham Arbitration Testimony (Bermingham) 88:11–20.) Moreover, the record shows that Plaintiff was disciplined multiple times during his employment. (Doc. 39-23; Doc. 39-28; Doc. 39-41, p. 12.)

Viewing the facts in the light most favorable to Plaintiff, a jury could conclude that Plaintiff's protected speech was the but-for cause of his termination. On these facts, a jury might also conclude that Plaintiff's disciplinary record would have resulted in his termination notwithstanding his protected speech. Thus, there is a genuine dispute as to a material fact and summary judgment on Plaintiff's § 1983 claim is due to be denied.

---

[6] Based on this evidence, the Court assumes but does not decide that Plaintiff's speech was a substantial factor in his termination. As discussed below, the but-for test presents a genuine dispute of material fact. Therefore, the Court does not make a final factual determination with respect to the substantial factor issue at this time.

## II.  Municipal Liability

"[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Rather, a municipality is liable only if its official custom or policy deprived a plaintiff of his constitutional rights. *Id.* at 694. Municipal liability may lie if a municipal policymaker maintained a policy of deliberate indifference towards the risk of causing a constitutional or statutory violation. *See Connick v. Thompson*, 131 S. Ct. 1350, 1359–60 (2011); *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 411 (1997). Deliberate indifference has three components:  (1) subjective knowledge of a potential constitutional violation; (2) disregard of that risk; and (3) conduct that is more than mere negligence. *See, e.g.*, *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999).

Plaintiff argues that City Manager Saunders was deliberately indifferent towards Plaintiff and that this deliberate indifference constituted a City policy.[7] (Doc. 41, pp. 26–29.) Specifically, Plaintiff submits that Saunders was deliberately indifferent towards Plaintiff's alleged constitutional injury because he affirmed Plaintiff's termination after a cursory investigation. (*Id.*)

Construing the facts in the light most favorable to Plaintiff, a fact-finder could determine that the City was deliberately indifferent towards Plaintiff's termination. Saunders knew that Plaintiff was terminated after accusing Graham of criminal misconduct. (Saunders Dep. 46:5–18.) Saunders admitted that he did not review all of

---

[7] The Court assumes for purposes of this Order, but does not decide that Saunders was the City's final policymaker. As the City Manager, Saunders was the City's Chief Operating Officer and the head of the administrative branch of the City government. *See* Clermont, Fla., Municipal Code § 32(a). Further, the City's disciplinary appeal system requires aggrieved police officers to appeal directly to the City Manager. (Graham Dep. 34:25–35:5, 51:25–52:4.) The parties may revisit this issue at an appropriate time in the future.

the relevant documents and evidence before affirming Plaintiff's termination. (*Id.* at 82:9–83:1.) Also, though Saunders would typically speak with Graham after hearing a police officer's grievance, Graham could not recall Saunders questioning him during Plaintiff's appeal. (Graham Dep. 52:18–53:18.) Saunders also knew that Plaintiff's discipline was perceived as unfair by Plaintiff and by members of the public, yet he did not independently investigate that discipline. (Saunders Dep. 34:3–35:18, 37:5–38:6.) Thus, it is conceivable that Saunders was aware of a potential constitutional violation and knowingly disregarded that risk by superficially investigating Plaintiff's termination.

Conversely, construing the facts in the light most favorable to Defendants, a fact-finder could reasonably determine that the City did not act with deliberate indifference. Saunders testified that the grievance procedures were properly followed. (*Id.* at 79:7–13.) He also noted that he had previously reversed other disciplinary decisions made by Graham. (*Id.* at 75:1–76:16.)

As a genuine dispute of material fact exists, neither side has satisfied its burden of proving that summary judgment is appropriate. The parties' cross-motions for summary judgment on the City's liability are therefore due to be denied.[8]

## III. LEOBOR Claim

Finally, the Court turns to Plaintiff's LEOBOR claim. Plaintiff contends that Defendants' conduct in terminating him violated the LEOBOR because the Defendants: (1) failed to interview all identifiable witnesses; and (2) failed to provide Plaintiff with

---

[8] Counts I and II of Plaintiff's complaint also allege entitlement to punitive damages on Plaintiff's § 1983 claim. (Doc. 1, ¶¶ 60, 68.) However, municipalities are immune from liability for punitive damages under § 1983. *See City of Newport v. Fast Concerts, Inc.*, 453 U.S. 247, 271 (1981). Consequently, summary judgment on Plaintiff's claims for punitive damages against the City is due to be granted in favor of the City on this issue.

adequate notice of the charges against him. (Doc. 41, pp. 29–30.) Plaintiff seeks injunctive relief, damages, and attorney's fees. (Doc. 1, ¶ 74.)

The LEOBOR does not create a statutory right for damage suits against an employer. *See McRae v. Douglas*, 644 So. 2d 1368, 1375 n.6 (Fla. 5th DCA 1994). Rather, it "operates only to immediately restrain violation of the rights of police officers by compelling performance of the duties imposed by Sections 112.531 to 112.533 . . . . [T]his section [does not] creat[e] a right to injunctive relief in the form of reinstatement after discharge." *Migliore v. City of Lauderhill*, 415 So. 2d 62, 65 (Fla. 4th DCA 1982); *see also City of Miami v. Cosgrove*, 516 So. 2d 1125, 1128 (Fla. 3rd DCA 1987) ("[The LEOBOR] is not a vehicle for the restoration of substantive rights, whether the restoration is sought by mandamus, injunction, or . . . an action for damages."). Thus, the LEOBOR does not entitle Plaintiff either to damages or to injunctive relief to reinstate his employment. As such, summary judgment as to Plaintiff's LEOBOR claim is due to be granted in favor of Defendants.

## CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1.  Defendant Stephen Graham's Motion for Summary Judgment (Doc. 39) is **GRANTED IN PART** and **DENIED IN PART**. It is granted as to Plaintiff's LEOBOR claim and denied in all other respects.

2.  Plaintiff's Cross-Motion for Summary Judgment and Supporting Memorandum of Law (Doc. 41) is **DENIED.**

3.  Defendant City of Clermont, Florida's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 45) is **GRANTED IN PART** and **DENIED IN PART**. It is granted as to Plaintiff's claims for punitive

damages and Plaintiff's LEOBOR claim and denied in all other respects.

**DONE AND ORDERED** in Chambers in Ocala, Florida, on July 31, 2013.

ROY B. DALTON JR.
United States District Judge

Copies:
Counsel of Record